**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PATRICIA FOX, on behalf of herself and all others similarly situated,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **No. 12 C 9350** |
| **PRIME GROUP REALTY TRUST, et al.** | ) ) | |
| **Defendants.** | ) ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Patricia Fox, on behalf of a putative class of minority shareholders, has sued to enjoin Prime Group Realty Trust (PGRT), its directors, and PGRT's majority shareholder Five Mile Capital Partners LLC and its affiliates (Five Mile), from proceeding with a proposed cash-out merger transaction between PGRT and Five Mile. Plaintiffs claim that defendants have breached their fiduciary duties owed to plaintiffs as minority shareholders and have breached their disclosure duties by failing to provide material information necessary for shareholders to cast an informed vote on the proposed merger.

Plaintiffs have moved for a preliminary injunction. Both sides have submitted affidavits and documentary evidence in support of their respective positions. The Court also held a hearing at which several witnesses testified. Defendants have moved to strike the opinion of plaintiffs' disclosure expert. For the reasons stated below, the Court denies plaintiffs' motion for a preliminary injunction and also denies defendants'

motion to strike.  This constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(2).

## Background

PGRT, a Maryland corporation, is a real estate investment trust that currently owns and manages two office buildings in the Chicago metropolitan area:  330 N. Wabash in Chicago and 4343 Commerce Court in Lisle.

In 1998, PGRT issued four million shares of Series B Cumulative Redeemable Preferred Stock (preferred shares).  Under the Articles Supplementary, a document that, among other things, describes the rights of the preferred shareholders, preferred shareholders are entitled to vote on any proposed merger that will result in the exchange of their shares.  For a merger to take place, at least two-thirds of the preferred shareholders must vote in its favor.

In 2005, a subsidiary of The Lightstone Group (Lightstone) acquired all of PGRT's outstanding common shares.  That same year, Lightstone elected John Sabin, Shawn Tominus, and George Whittemore to PGRT's board of trustees.  On February 11, 2011, Lightstone transferred all of its common shares back to PGRT for no financial consideration, leaving the preferred shareholders as PGRT's sole shareholders.  Sabin, Tominus, and Whittemore remained on PGRT's board.

On February 14, 2011, PGRT and Five Mile, a Connecticut-based investment and asset management company, announced a joint venture agreement concerning the 330 N. Wabash building as well as a proposed merger agreement.  Under the terms of the joint venture, PGRT contributed its interest in the 330 N. Wabash building, Five Mile contributed financing, the building's lender was paid, and the loan was written down.

According to PGRT, "[t]he joint venture with Five Mile for the 330 N. Wabash property provide[d] the capital resources necessary to lease up the property to stabilization." Pls.' Ex. 3. With respect to the proposed merger agreement, Five Mile made a tender offer for $5.00 per share for PGRT's preferred shares. On April 5, 2011, PGRT issued a proxy statement concerning the proposed merger. PGRT administered a vote of the preferred shareholders on June 6, 2011. Because less than two-thirds of the preferred shareholders voted for the merger, the merger failed.

In October 2011, PGRT and Five Mile announced a common stock purchase agreement pursuant to which PGRT would sell new common shares to Five Mile. The agreement also provided that Five Mile would make a tender offer to purchase PGRT's preferred shares for a purchase price no less than $5.00 per share. According to PGRT, the board derived this price from Duff & Phelps, LLC (D&P), its independent financial advisor, which provided a fairness opinion and determined that $5.00 per share represented a premium of approximately 86% over the high end of D&P's valuation range of the preferred shares at that time.

The common stock purchase agreement contained a "go shop" provision allowing PGRT to seek a better offer for the preferred shares and a "fiduciary out" provision allowing PGRT to walk away from the agreement without paying a breakup fee if it received a better offer. The agreement stated that the buyout of the preferred shareholders required the approval of two-thirds of those shareholders. PGRT hired Compass Point Research & Trading, LLC, an independent investment banking firm, to conduct a "market check." Compass Point identified and contacted twenty-seven potential purchasers in an effort to get a superior offer, but none of them entered into

3

substantive discussions with PGRT or proposed an offer better than Five Mile's proposal.

After the sale of common stock to Five Mile closed, Five Mile, pursuant to a settlement agreement in litigation brought by a PGRT shareholder, agreed to increase its tender offer price for the preferred shares to $5.25 per share. A number of preferred stockholders tendered their shares, leaving Five Mile with 100 percent of PGRT's common shares and approximately sixty-five percent of PGRT's preferred shares.

At PGRT's annual meeting of shareholders on March 29, 2012, Five Mile voted its shares and elected five trustees, one of whom was Tominus. Because of the change in control, Sabin volunteered to resign from the board. Five Mile and PGRT management told Sabin that they wanted him to stay on the board. As a result, Five Mile nominated trustees Sabin and Whittemore to fill two trusteeships reserved for the preferred shareholders. Another preferred shareholder nominated Samuel Orticelli. The preferred shareholders, including a majority of the non-Five Mile preferred shareholders, voted overwhelmingly to keep Sabin and Whittemore on the board.

In conjunction with refinancing the 330 N. Wabash building, PGRT's proposed lender retained Cushman & Wakefield (C&W) to conduct an appraisal. C&W released its appraisal of the building on May 25, 2012, and the lender loaned PGRT $200 million secured by a mortgage on the building.

On June 27, 2012, PGRT announced that it had received an offer from Five Mile to acquire the balance of the preferred shares for $5.25 per share in cash. Like the 2011 common stock purchase agreement, the proposed cash-out merger agreement did not include any measures preventing PGRT from accepting a superior offer, nor did

it provide for a breakup fee. The agreement also required the approval of two-thirds of the preferred shareholders.

The next day, the trustees formed a special committee consisting of outside trustees Sabin, Whittemore, and Tominus to evaluate the proposed cash-out merger. Throughout the summer and fall of 2012, the special committee members participated in a half-dozen meetings, had a number of conversations with each other and counsel, and reviewed documents relating to the transaction. Given how recently PGRT had unsuccessfully "shopped" the 2011 transaction, the special committee decided not to engage an investment banker to conduct a market check. The committee did, however, retain D&P to provide an opinion on the fairness of the merger consideration. The committee provided to D&P, among other things, a copy of the draft merger agreement; audited financial statements; internal financial statements; documents regarding PGRT's current operations, probable future outlook, and current real estate holdings; and the C&W appraisal of the 330 N. Wabash building.

On July 31, D&P presented the special committee with its preliminary opinion. This included a valuation of the preferred stock, which D&P advised was worth between $1.90 and $2.10 per share. Though D&P considered the C&W appraisal, it did not rely on the appraisal in forming its fairness opinion.

After receiving D&P's opinion, the special committee questioned D&P's assumptions and methodology to determine whether there was any "additional value for the preferred [shareholders]." Sabin Dep. at 135:4-137:13, 140:2-141:23. In an effort to "get as high a value for the preferred as possible," the special committee directed D&P to reconsider its assumptions. *Id.* at 139:7-141:23.

On August 7, 2012, D&P presented a revised opinion to the special committee, valuing the shares between $2.37 and $2.52 each. The special committee again questioned D&P regarding its assumptions and methodologies, why certain assumptions had changed from D&P's preliminary analysis, and what factors could impact the valuation range. D&P ultimately concluded that the high end of the range of fair value was $2.52 per share.

The special committee also engaged another financial advisor, W&D Consulting LLC, to perform a "sensitivity analysis" on D&P's model. On September 5, 2012, W&D presented its results to the Special Committee. A representative from W&D stated that D&P may not have given sufficient credence to the C&W appraisal. Nevertheless, the high end of W&D's sensitivity analysis regarding the value of the preferred shares was still lower than the $5.25 offered by Five Mile.

On September 21, 2012, Sabin met with members of Five Mile in New York to attempt to negotiate a higher price for the preferred shares. Prior to this meeting, Sabin had never had any in-person contact with anyone from Five Mile. Following several hours of discussion, Sabin made a counteroffer of $5.35 per preferred share. Five Mile stated that it would take the counteroffer under consideration. On September 24, 2012, however, Five Mile notified the special committee that it had rejected the counteroffer.

The special committee then voted to recommend the merger to the PGRT board. It based this on a number of factors, including that $5.25 per share represented "the most favorable financial terms that could be obtained from Five Mile," D&P's opinion that this consideration was fair, and the fact that the preferred shares had "historically

traded infrequently and in small volumes." Defs.' Ex. A at 25-26. The board approved the merger on September 26, 2012.

At the end of October 2012, PGRT issued a 173-page proxy statement concerning the proposed merger. The proxy statement included information regarding the process by which the special committee had evaluated and approved the merger, a summary of D&P's fairness opinion and valuation analysis, and an annexed copy of D&P's fairness opinion and PGRT's most recent annual financial statements. On December 5, 2012, approximately seventy-four percent of the preferred shareholders voted in favor of the merger.

Plaintiffs have moved for a preliminary injunction barring the merger from proceeding. As indicated earlier, defendants have moved to strike the opinion of plaintiffs' disclosure expert. Defendants contend that the expert's opinion is inadmissible because he is not qualified to opine on the adequacy of PGRT's legal disclosures and because he has provided legal conclusions. The Court need not rule on defendants' motion, however, because the expert's testimony does not affect the outcome of plaintiffs' motion for preliminary injunction. The Court therefore denies the motion to strike as moot.

## Discussion

To obtain a preliminary injunction, a plaintiff must show that she has some likelihood of success on the merits and that if an injunction is not granted, she will suffer irreparable injury for which she lacks an adequate legal remedy. *See, e.g., Foodcomm Int'l v. Barry,* 328 F.3d 300, 303 (7th Cir. 2003). If the plaintiff fails to meet any one of these prerequisites, the motion for a preliminary injunction must be denied. *See, e.g.,*

*Cox v. City of Chicago,* 868 F.2d 217, 223 (7th Cir. 1989).  If the plaintiff establishes these prerequisites, the court balances the harm to the plaintiff if an injunction is not issued against the harm to the defendants if it is issued.  *Foodcomm Int'l*, 328 F.3d at 300

The threshold factor is likelihood of success on the merits.  *See Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1213 (7th Cir. 1997).  A likelihood of success exists if the party seeking injunctive relief shows that is has a "better than negligible" chance of winning on the merits.  *Meridian Mutual Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1114-15 (7th Cir. 1997).

Plaintiffs argue that they have shown a likelihood of success with respect to both of their claims:  (1) defendants breached their disclosure duties by failing to provide material information necessary for plaintiffs to cast an informed vote on the proposed merger, and (2) defendants breached their fiduciary duties by using an unfair process to evaluate the cash-out merger and by agreeing upon an unfair price for plaintiffs' preferred shares.

## A.     Breach of duty to disclose

Plaintiffs claim that the PGRT board violated its duty of disclosure by depriving the preferred shareholders of material information needed to cast an informed vote on the proposed merger.  To determine which state's substantive law should be used to evaluate such a claim, the Court looks to the choice of law rules of Illinois, the forum state.  *See Sound of Music Co. v. Minnesota Min. & Mfg. Co.*, 477 F.3d 910, 915 (7th Cir. 2007).  Illinois has adopted the internal affairs doctrine, under which the law of the state of incorporation applies in cases involving issues of corporate governance.  *See*

*Kellers Systems, Inc. v. Transport Int'l Pool, Inc.*, 172 F. Supp. 2d 992, 1000 (N.D. Ill. 2001); *Jano Justice Systems, Inc. v. Burton*, No. 08 C 3209, 2010 WL 2012941, at *6 (C.D. Ill. May 20, 2010). Thus, because PGRT is organized under Maryland law, Maryland law controls. Maryland courts, in turn, look to Delaware law in matters involving business law where no controlling Maryland law exists. *See Kramer v. Liberty Prop. Trust*, 408 Md. 1, 24, 968 A.2d 120, 134 (2009) ("[B]ecause Delaware courts have gained a reputation for their expertise in matters of corporate law, we deem decisions of the Delaware Supreme Court and Court of Chancery to be highly persuasive.").

Both Maryland and Delaware law provide that when presented with a merger proposal, the directors of a corporation are "obliged to disclose with entire candor all material information concerning the merger." *See McMullin v. Beran*, 765 A.2d 910, 917 (Del. 2000); *Parish v. Md. & Va. Milk Producers Ass'n*, 250 Md. 24, 74, 242 A.2d 512, 539 (1968) ("It is clear that officers and directors of a corporation stand in a sufficiently confidential relation to the corporation's stockholders to impose a duty upon them to reveal all facts material to the corporate transactions"). The law, however, does not require directors to disclose all available information merely because investors might find it helpful. *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000) ("Omitted facts are not material simply because they might be helpful."). Rather, an omitted fact is considered material only if "there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *In re Netsmart Techns., Inc. v. S'holders Litig.*, 924 A.2d 171, 199 (Del. Ch. 2007) (citation and internal quotation marks omitted). As applied to this case, an omitted fact is material if it is substantially

likely that a reasonable investor would consider it important in deciding how to vote. *Arnold v. Soc'y for Sav. Bancorp., Inc.*, 650 A.2d 1270, 1290 (Del. 1994).

Plaintiffs do not identify clearly the omitted facts that they contend are material, nor are they consistent in arguing what omitted facts are material. For instance, plaintiffs assert in their motion for preliminary injunction that PGRT failed to adequately disclose its finances and the compensation of certain trustees, yet they fail to argue this point in their brief. The Court has nevertheless identified from plaintiffs' brief three categories of information that they argue should have been but were not included in PGRT's proxy statement: (1) further details underlying the valuation analyses of D&P's fairness opinion; (2) the higher valuations in the C&W appraisal; and (3) the fact that D&P considered, but did not rely upon, the C&W appraisal..

With respect to the valuation analyses in D&P's fairness opinion, plaintiffs seek a level of disclosure that exceeds what courts have previously held as sufficient. Plaintiffs argue that PGRT's proxy statement failed to include enough detail concerning D&P's analyses in support of its fairness opinion to permit a reasonable investor to confirm D&P's valuation or understand how D&P made it. Though an endorsement of the fairness of a transaction must be accompanied by the valuation method used to arrive at that opinion, *In re Netsmart Techns.*, 924 A.2d at 204, the duty of disclosure does not require directors to disclose enough information to enable shareholders to "make an independent determination of fair value." *In re Staples S'holders Litig*, 792 A.2d 934, 954 (Del. Ch. 2001) (internal quotation marks omitted). Rather, shareholders are entitled only to a "fair summary of the substantive work performed by the investment

bankers upon whose advice the recommendations of the [] board as to how to vote . . . rely." *In re Netsmart Techns.*, 924 A.2d at 204.

The proxy statement contains sufficient disclosures concerning D&P's work. It explains that D&P arrived at its opinion by reviewing, among other things, the draft merger agreement, PGRT's financial statements and operating data, internal documents regarding the future outlook of the company, and documents related to PGRT's real estate holdings. The proxy statement further summarizes the various valuation methods D&P used in providing its fairness opinion. For instance, the proxy statement explains how D&P calculated the value of PGRT's interest in the 330 North Wabash building, including the capitalization and discount rates that it applied.

Plaintiffs argue that this summary, along with the appended opinion, is inadequate. They essentially argue that the disclosures should be sufficient to permit them to reverse-engineer how D&P arrived at its opinion on the fairness of the offered merger consideration. The Court finds no authority supporting this argument. "[C]ourts have repeatedly held that a board need not disclose specific details of the analysis underlying a financial advisor's opinion." *Cnty. of York Employees Ret. Plan v. Merrill Lynch & Co.*, No. 4066, 2008 WL 4824053, at *12 (Del. Ch. Oct. 28, 2008) (internal quotation marks omitted).

Plaintiffs also contend that "[d]efendants' failure to cite known, contrary valuations shows that [d]efendants failed to meet their duty to disclose." Pls.' Br. at 24. The evidence tends to show, however, that C&W's valuation of the 330 N. Wabash building was immaterial. According to D&P, reliance on C&W's valuation would not have changed the ultimate conclusion of its fairness opinion. *See* Prindle Decl. ¶¶ 15-

11

17.  Had it used C&W's figures for the value of the building, D&P would have arrived at a fair value of between $4.25 and $4.54 per share, a price range still well below the proposed merger consideration of $5.25.  *Id.*  Plaintiffs contend that because this adjusted range is higher than the range D&P arrived at and closer to the $5.25 price, its nondisclosure is material because a reasonable shareholder might be prompted to vote no on the merger in hopes of negotiating an even more favorable price.  It is more likely, however, that a disclosure of yet another valuation below the offered price would serve to reinforce the proposition that Five Mile is offering fair consideration.

Plaintiffs finally argue that the fact that D&P "considered and rejected" the C&W appraisal is a material fact that defendants should have disclosed in the proxy statement.  Pls.' Br. at 24.  It is undisputed that PGRT gave D&P the C&W appraisal for its consideration.  In D&P's view, however, some of C&W's assumptions were "overly optimistic," thereby inflating its valuation.  *See* Prindle Decl. ¶ 12.  D&P chose not to rely on C&W's valuation, believing that its own analysis was "more financially sound and more accurate."  *Id.*. ¶ 14.  Information not relied upon by financial advisors in forming their opinions need not be disclosed to investors.  *See In re Micromet Inc. S'holders Litig.*, No. 7197, 2012 WL 681785, at *13 (Del. Ch. Feb. 29, 2012).

In sum, the Court finds that plaintiffs have failed to show a reasonable likelihood of success on their claim that the board breached its duty of disclosure by its omissions.

## B.    Breach of fiduciary duties

Plaintiffs claim that the board breached its fiduciary duties to the remaining preferred shareholders because the process it used to evaluate the cash-out merger and the price it agreed to were unfair.  There are three tiers of review for evaluating director decision-making:  the business judgment rule, the enhanced scrutiny standard,

and "entire fairness." *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011).

The entire fairness of a cash-out merger is scrutinized by the courts where a majority of the directors approving the merger were interested or where a majority stockholder stands on both sides of the transaction. *In re Budget Rent A Car Corp. S'holders Litig.*, No. 10418, 1991 WL 36472, at *225 (Del. Ch. Mar. 15, 1991); *see Kahn v. Lynch Commc'n Sys.*, 638 A.2d 1110, 1117 (Del. 1994) ("[T]he exclusive standard of judicial review in examining the propriety of an interested cash-out merger transaction by a controlling or dominating shareholder is entire fairness"). "Directors are 'interested' if they 'appear on both sides of a transaction [or] expect to derive any personal financial benefit from it in the sense of self-dealing as opposed to a benefit which devolves upon the corporation or all stockholders generally." *In re Budget Rent A Car Corp.*, 1991 WL at 36472, at *225 (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)). In these circumstances, the entire fairness standard applies "even when an interested merger receives the informed approval of a majority of the minority stockholders or an independent committee of disinterested directors." *Kahn*, 638 A.2d at 1117.

Plaintiffs contend that the entire fairness standard applies. They have alleged, and defendants do not dispute, that Five Mile elected a majority of the trustees on the PGRT board prior to the merger negotiations. Because a majority of the trustees owed their positions to Five Mile and thus in effect stood on both sides of the transaction, the Court applies the entire fairness standard to review the proposed cash-out merger. Defendants therefore bear the burden of proving that the transaction was entirely fair. *See Am. Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (De. 2012).

The entire fairness standard has two basic requirements: fair dealing and fair price. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983). The fair dealing requirement involves process, and involves "when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Id.* The fair price requirement concerns the "economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Id.* Although the concept of entire fairness has two components, the analysis is not bifurcated. Rather, the Court "'determines entire fairness based on all aspects of the entire transaction.'" *In re John Q. Hammons Hotels Inc. S'holders Litig.*, No. 758, 2009 WL 3165613, at *13 (Del. Ch. Oct. 2, 2009) (citing *Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 746 (Del. Ch. 2007)); *see also Weinberger*, 457 A.2d at 711 (explaining that entire fairness of a transaction must be shown with respect to both process and price). By itself, the fact that defendants did not require approval by a "majority of the minority" does not mean that fair dealing was absent. *See In re John Q. Hammons Hotels Inc.*, 2009 WL 3165613, at *13.

In *Weinberger*, the Delaware Supreme Court outlined the kind of evidence that would be reliable in demonstrating the entire fairness of a transaction. The defendants in that case had failed to show that the merger in question was entirely fair. The court suggested, however, that the result "could have been entirely different if [the defendants] had appointed an independent negotiating committee of its outside directors to deal with [the controlling shareholder] at arm's length," because "fairness . .

. can be equated to conduct by a theoretical, wholly independent, board of directors."
*Weinberger*, 457 A.2d at 709-10 n. 7.  The court stated that "a showing that the action taken was as though each of the contending parties had in fact exerted its bargaining power against the other at arm's length is strong evidence that the transaction meets the test of fairness."  *Id.*

Since *Weinberger*, courts have identified additional indicia of fairness.  These include diligent efforts by an independent special committee to obtain the best possible deal, the existence of a pre- or post-signing market check, and a showing that the deal price represents a premium over the trading price of the company's shares.  *See In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 534 (Del. Ch. 2003); *see also S. Muoio & Col. LLC v. Hallmark Entm't Invs. Co.*, No. 4729, 2011 WL 863007, at *9 (Del. Ch. Mar. 9, 2011) (finding transaction was entirely fair because the special committee was "truly independent, fully informed, and had the freedom to negotiate at arms' length").

Reviewing the transaction as a whole, the Court finds that plaintiffs are unlikely to succeed on their claim that the merger was not entirely fair.  Defendants have shown that the day after receiving Five Mile's offer, the trustees formed a special committee consisting of trustees Sabin, Tominus, and Whittemore, all three of whom had been elected to the board in 2005, long before Five Mile ever came into the picture.  The evidence reflects that they were, in fact, independent of Five Mile.  In addition, they were well-qualified individuals with business experience and relevant expertise gained from prior service on boards of companies that had received merger proposals.  The evidence shows that they communicated frequently, participating in a half-dozen meetings throughout the summer and fall of 2012, and speaking on the phone with each

other and with legal counsel between meetings. Moreover, the individual members of the special committee spent up to fifteen to twenty hours per week evaluating the offer. This evidence strongly supports a finding of procedural fairness.

The evidence also suggests that the special committee dealt with Five Mile on an arm's-length basis. The committee had full authority to negotiate with Five Mile and did in fact attempt to negotiate an increase of the merger consideration. Sabin flew to New York to meet with Five Mile, spent several hours discussing the offer with them, and made a counter-offer of $5.35 per share. Though Five Mile later rejected this counter-offer and the special committee nonetheless ultimately endorsed the fairness of the consideration offered, there is no evidence indicating that Five Mile in any way coerced or intimidated the special committee into accepting the $5.25 share price – evidence that *would* be indicative of unfairness. *See, e.g., Kahn*, 638 A.2d at 1120-21 (finding controller's threat that rejecting offer would lead to hostile transaction at lower price showed there was no "semblance of arm's length bargaining"). Instead, the evidence reflects that the special committee's decision-making was voluntary and that its negotiations with Five Mile were conducted at arm's length. These facts further indicate that the transaction is entirely fair.

The evidence also indicates that the special committee worked diligently to attempt to get the best price for plaintiffs. In the context of a cash-out merger, directors owe shareholders a duty of good faith to maximize shareholder value. *See Revlon v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182 (Del. 1986); *Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 340, 983 A.2d 408, 421 (2009) (adopting in Maryland the duty to maximize shareholder value articulated in *Revlon*). In carrying out

this duty, the special committee not only hired outside financial advisor D&P to conduct a valuation analysis, but it also carefully scrutinized D&P's methodology and twice directed D&P to reconsider its assumptions. Even after making this effort, the special committee engaged a second financial advisor, W&D, to perform a "sensitivity analysis" on D&P's model to test its valuation ranges and assess whether any variables should be changed. Only after both D&P and W&D's analyses came out lower than the $5.25 offered by Five Mile did the special committee conclude that the offer was fair. And even then, as discussed above, Sabin negotiated with Five Mile to attempt to get plaintiffs ten cents more per share.

Plaintiffs argue that the transaction was unfair because the special committee failed to maximize shareholder value by hiring an investment banker to "shop" the transaction. Pls.' Br. at 21-22. Courts have noted, however, that "there is no single blueprint" that directors must follow to fulfill their duty to get the best price for stockholders in a sale of the company. *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1286 (Del. 1989); *Jasinover v. Rouse Co.*, No. 13 C 04-59594, 2004 WL 3135516, at *9 (Md. Cir. Ct. Nov. 4, 2004) ("Maryland does not require an auction when the decision is made to sell a corporation. There is no requirement that the [b]oard fully shop the company to multiple bidders."). "Directors are generally free to select the path to value maximization, so long as they choose a reasonable route to get there." *In re Answers Corp. S'holders Litig.*, No. 6170, 2011 WL 1366780, at *3 (Del. Ch. 2011) (internal quotation marks omitted).

Defendants' decision not to engage an investment firm to shop the 2012 transaction does not suggest that they failed in their duty to maximize shareholder value

17

or that the merger was unfair.  Just one year earlier, PGRT had retained an independent investment banker that pursued twenty-seven potential purchasers, none of which made a better offer than Five Mile or even entered into substantive discussions.  Sabin stated that because the 2011 transaction was so similar and the price offered then was lower than what Five Mile offered, the special committee believed that it was unlikely that PGRT would get an offer better than Five Mile's and thus decided against engaging an investment banker.  Given these circumstances, the fact that the committee did not try to shop the deal does not suggest an absence of fair dealing or a fair price.

The special committee also insisted that there be no deal protection measures precluding PGRT from accepting a superior offer, even though the inclusion of deal protection provisions are customary in merger transactions.  *See In re Answers Corp. S'holders Litig.*, 2011 WL 1366780, at *4 (finding no breach of fiduciary duty where merger agreement contained a "no-talk" provision limiting the board's ability to discuss alternative proposals with unsolicited bidders).  By doing so, the committee built a market check into the terms of the merger agreement that gave it negotiating leverage to attempt to extract better terms.

In light of these factors, the Court cannot conclude that plaintiffs have shown a likelihood of success on their contention that fair dealing was lacking.  Rather, the evidence reflects that the process of structuring and negotiating the merger consideration was fair.

"A strong record of fair dealing can influence the price inquiry."  *Reis*, 28 A.3d at 467.  As the Court has discussed, the special committee relied on the advice of financial

advisors who concluded that the value of $5.25 per share was fair. The Court concludes that plaintiffs have failed to show a likelihood of success regarding the claimed unfairness of the merger price.

Because plaintiffs have not shown any likelihood of success on the merits, the Court need not address the remaining requirements for issuance of a preliminary injunction.

### Conclusion

For the foregoing reasons, the Court denies plaintiffs' motion for a preliminary injunction [docket no. 3], and denies as moot defendants' motion to strike [docket no. 49]. The case is set for a status hearing on January 17, 2013 at 9:30 a.m. to set a schedule for further proceedings.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  December 21, 2012