IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PATRICIA FOX, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | No. 12 C 9350 |
| RIVERVIEW REALTY PARTNERS, f/k/a Prime Group Realty Trust, et al., | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Patricia Fox, on behalf of a putative class of former preferred shareholders, filed

suit against Prime Group Realty Trust (PGRT), its directors, and Five Mile Capital

Partners LLC and its affiliates (Five Mile), alleging breach of fiduciary duty and unjust

enrichment claims. Fox has now moved pursuant to Federal Rule of Civil Procedure

23(b)(3) for certification of a class of similarly situated plaintiffs. For the reasons stated

below, the Court grants Fox's motion but narrows the class definition in one respect.

### Background[1]

In her amended complaint, Fox alleged that PGRT (now called Riverview Realty

Partners), its directors, and its management breached fiduciary duties owed to Fox and

---

[1] The Court assumes familiarity with Fox's allegations in this case and will summarize
them only briefly here. A more detailed recounting of Fox's allegations can be found in
the Court's May 10, 2013 decision on defendants' motion to dismiss. *See Fox v.
Riverview Realty Partners*, No. 12 C 9350, 2013 WL 1966382, at *1–3 (N.D. Ill. May 10,
2013).

other preferred shareholders and that Five Mile aided and abetted these breaches. Fox also alleged self-dealing on the part of PGRT's officers. She further claimed that Five Mile breached its fiduciary duties as a majority shareholder and was unjustly enriched as a result.

PGRT was a real estate investment trust organized under the laws of Maryland. The company owned, managed, and leased office buildings, including one at 330 N. Wabash Avenue in Chicago. Fox, along with several others, owned shares of Series B Cumulative Redeemable Preferred Stock in PGRT. In February 2011, a company called the Lightstone Group, which held all of PGRT's outstanding common shares, returned those shares to PGRT for no financial consideration. This action left the preferred shareholders such as Fox as PGRT's sole shareholders. That same month, PGRT entered into a joint venture agreement and proposed merger agreement with Five Mile, an investment and asset management company. In connection with the proposed merger, Five Mile made a tender offer of $5.00 per share for PGRT's preferred shares and offered retention and incentive plan payments to PGRT's officers. The trustee defendants stated in the proposed merger proxy statement that if the merger was not approved, the board would authorize a dividend in the form of common stock to be issued to the preferred shareholders on a basis of one common share for each preferred share outstanding.

The preferred shareholders rejected the proposed merger with Five Mile in June 2011 and elected two trustees to PGRT's board. The newly constituted board then amended PGRT's declaration of trust to grant the preferred shareholders voting rights, and it scheduled an annual meeting to vote on the amendment. PGRT's board later

postponed the annual meeting. Fox alleges that, prior to the meeting, PGRT negotiated a common share issuance and tender offer transaction with representatives of Five Mile. PGRT's board then held a board meeting on October 10, 2011 and voted to approve the common share issuance to Five Mile. Five Mile then agreed to increase its tender offer price for preferred shares to $5.25 per share, pursuant to a settlement agreement. After several preferred stockholders tendered their shares, Five Mile was left with 100 percent of PGRT's common stock and sixty-five percent of PGRT's preferred shares. In June 2012, Five Mile made an offer to the board to acquire the balance of the preferred shares that Five Mile did not yet own, at the same $5.25 price. After Five Mile rejected a counteroffer of $5.35 from John Sabin, a member of a special committee appointed by PGRT's board, the special committee unanimously voted to recommend the merger with Five Mile to the board. The board subsequently approved the merger, and in October 2012, PGRT issued a proxy statement to the preferred shareholders, after which Fox commenced this suit. On December 5, 2012, approximately seventy-four percent of the preferred shareholders voted in favor of the merger.

Fox thereafter moved for a preliminary injunction to bar the merger from proceeding. This Court denied the motion on December 21, 2012. *See Fox v. Prime Group Realty Trust,* No. 12 C 9350, 2012 WL 6680349 (N.D. Ill. Dec. 21, 2012). In February 2013, defendants moved to dismiss Fox's complaint for failure to state a claim. The Court dismissed the first two of Fox's breach of fiduciary duty claims as to PGRT, concerning the common stock issuance and the 2012 merger, but otherwise declined to dismiss the claims. The Court also dismissed the aiding and abetting claim against Five

Mile and dismissed in its entirety Fox's claim that PGRT's officers engaged in self-dealing. The Court otherwise denied the motion to dismiss.

In August 2013, defendants moved to disqualify Fox's attorneys from the case, as well as Fox herself as a proposed class representative. Defendants argued that Fox's counsel and Fox herself had received documents protected by defendant Five Mile Capital Partners' attorney-client and work product privileges. The Court denied the motion. *See* Dec. 10, 2013 Order on Defs.' Motion for Disqualification [docket no. 137]. The Court concluded that none of the documents was protected by the attorney-client privilege and that six were protected by the work product doctrine but that none of the six had any substantial relationship to the present lawsuit. The Court also ordered Fox's counsel to locate and turn over to Five Mile all copies of the six documents that the Court had concluded were protected by the work product doctrine.

Fox filed her motion for class certification in August 2013. In response, defendants argue that Fox cannot show that common issues predominate, because she has not shown that damages can be determined on a class-wide basis. Further, defendants contend that Fox cannot show via common proof that all absent class members have standing, noting three groups that do not have standing. Third, defendants argue that Fox's unjust enrichment claim in particular is unfit for class-wide determination, because of a conflict within the class and because individualized fact determinations are necessary to determine validity of the claim. Finally, defendants maintain that both Fox and her counsel cannot adequately represent the class.

## Discussion

The Court must grant Fox's motion if she demonstrates that the proposed class

satisfies all of the requirements of Rule 23(a) and one of the requirements of Rule 23(b). Under Rule 23(a), the plaintiffs must demonstrate numerosity, commonality, typicality and adequate representation of the putative class. *See* Fed. R. Civ. P. 23(a). In this case, Fox seeks certification under Rule 23(b)(3), which requires her to show that "questions of law or fact common to class members predominate over any questions affecting only individual members" and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Furthermore, "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.*

## A. Standing and numerosity

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." There is no bright-line test for numerosity, but courts have found that a class of forty is, or at least can be, sufficiently large to satisfy Rule 23(a)(1). *See Pruitt v. City of Chicago*, 472 F.3d 925, 926–27 (7th Cir. 2006) ("Sometimes even 40 plaintiffs would be unmanageable."); *Shields v. Local 705, Int'l Bhd. of Teamsters Pension Plan*, 188 F.3d 895, 897 (7th Cir. 1999) (noting that class consisted of class representative "and 35 other[s]"); *Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n. 9 (7th Cir. 1969) (even forty members could be sufficiently large to satisfy numerosity); *Costello v. BeavEx Inc.*, No. 12 C 7843, 2014 WL 1289612, at *8 (N.D. Ill. Mar. 31, 2014) ("A class consisting of more than 40 members generally satisfies the

numerosity requirement of certifying a class action.").

Fox argues that the proposed class satisfies the numerosity requirement because it has at least 100 members. Defendants do not challenge this number directly. They contend, however, that there are three subgroups of absent class members who lack standing. First, there are those shareholders who sued PGRT and other defendants in Maryland state court; defendants say that settlement of that case required the plaintiffs to release all claims related to this litigation. (They call this group the "Rameson plaintiffs," so named for the plaintiff in that case.) Second, there are the shareholders who tendered their shares to Five Mile, which included an agreement by which the shareholders would not retain rights to dividends on the sold shares. Finally, defendants point to shareholders who did not own shares during either the common share issuance or the 2012 merger and thus cannot challenge those transactions.

Defendants frame their standing argument as a roadblock to class certification, arguing that the Court should deny the motion to certify because certain unnamed plaintiffs do not have standing. As Fox correctly points out, it is necessary in the Seventh Circuit only for one named class plaintiff to have standing for the class to be certified. *See Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 676–77 (7th Cir. 2009) (dismissing challenge to class certification where defendants claimed some *named* plaintiffs lacked standing because "one is all that is necessary"); *see also Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 808–09 (7th Cir. 2013) (rejecting "unworkable view of Article III standing" encompassing standing challenges at class certification stage). In *Kohen*, the court said it "is almost inevitable" that "a class will often include persons who have not been injured by the defendant's conduct . . . because at the

outset of the case many of the members of the class may be unknown, or if they are known still the facts bearing on their claims may be unknown." *Kohen*, 571 F.3d at 677. And in *Parko v. Shell Oil Co.*, 739 F.3d 1083 (7th Cir. 2014), the Seventh Circuit rejected an argument that the class should be decertified because 140 of 150 members of the proposed class lacked standing. To decide otherwise "would require . . . 150 trials before the class could be certified"; the decision of "[h]ow many (if any) of the class members have a valid claim is the issue to be determined after the class is certified." *Id.* at 1084–85.

For the proposition that every single member of a class must have standing in order for the class to be certified, defendants cite a Ninth Circuit case that seems to be at odds with *Kohen* and *Parko*. *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012) ("[N]o class may be certified that contains members lacking Article III standing." (internal quotation marks omitted)). They also cite a Seventh Circuit case in which the proposed class was found indefinite because it included everyone in Illinois who bought a fountain Diet Coke after a certain date. *See Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006). That class included "[c]ountless" people who by definition could not ever show damages caused by the defendant's deception; the class definition did not account for such deception. *Id.* For this and other reasons, the district court's decision not to certify the class was not an abuse of discretion. The factual circumstances of *Oshana* were vastly different from this case, where far fewer class members reside on a defined list of known individuals who may lack standing.

Even if taken at face value, defendants' arguments are insufficient to preclude class certification. In a recent case, the Seventh Circuit declined to decertify a class

where the defendant argued that the class included "a number of individuals" who had not been harmed by defendants. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824–25 (7th Cir. 2012). The court noted its statement in *Kohen* that a class definition is too broad if "it contains a great many persons who have suffered no injury at the hands of the defendant." *Id.* at 825 (quoting *Kohen*, 571 F.3d at 677). Observing that the "great many" term was imprecise, the court in *Messner* nonetheless held that the defendant had "given no indication how many such individuals [who had not suffered harm] actually exist." *Id.* at 825. If it appeared to the district court during later discovery that the class was too broad, the court said the district court could "revisit this issue." *Id.* at 826. The same, of course, is true here.

The Court will not deny class certification based on the arguable lack of standing of certain unnamed class members. That said, one of the subclasses of plaintiffs without standing that defendants describe suggests a potential numerosity issue—with emphasis on "potential." As noted above, defendants argue that the Rameson plaintiffs previously agreed to a settlement in Maryland state court with PGRT, Five Mile, and other individuals. Via the settlement, the Rameson plaintiffs released all claims against PGRT and Five Mile relating to the common share issuance, 2011 merger, and the joint venture. The terms of the release are quite clear, and the Court agrees that the individuals who agreed to the release cannot be part of the class. Yet defendants have not informed the Court how many such people there are or who they are, even though they no doubt have this information. The settlement agreement they have provided names certain individuals and entities but also includes terms indicating that the list of parties to the agreement is or could be larger than the number of listed names. The

Court therefore concludes that the class is appropriately defined as excluding the Rameson plaintiffs. If this determination ultimately affects numerosity, defendants may file a motion to decertify at a later date.

## B.    Commonality and predominance

Fox contends that her proposed class satisfies the commonality requirement of Rule 23(a) because "each Class member's claims arise from . . . the capture and transfer of value from the B Shareholders." Pl.'s Mem. at 10. Defendants' conduct "identically impacted each Series B share by wrongfully stripping each share of its PGRT voting rights" and then, in the buyout of stock, "identically impacted each Series B share by cashing-out the shares using an unfair process and at an inadequate price." *Id.* at 10–11. As for predominance under Rule 23(b)(3), Fox says that proof of the elements of her claims "will rely predominantly, if not exclusively, on common evidence that applies equally" to all class members—not "on any individual relationship or communications." *Id.* at 16.

Defendants argue that certification should be denied because Fox has not proved "that damages are ascertainable on a class-wide basis" and thus that there is no commonality among class members or predominance of common questions. Defs.' Resp. at 7. Specifically, defendants say Fox has not provided a "damages methodology, which precludes class certification" under *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), and *Parko.* Defs.' Resp. at 8. Their criticism is based on this sentence in Fox's initial memo: "[A]ny questions relating to individual Class members, such as calculation of damages, can be mechanically answered on a per share basis from Class members' records of holdings of the B shares." Pl.'s Mem. at 16. This type

of statement, defendants contend, "is wholly insufficient" because it "is precisely the approach that was rejected by the Supreme Court in *Comcast*." Defs.' Resp. at 9. (They do not explain how *Comcast* rejected this approach.) Defendants argue that damages are especially uncertain with regard to Fox's claims about the November 2011 common share issuance. They say that if the damages are based on what common shares would have been worth if gifted to the preferred shareholders, the calculation would involve "numerous assumptions" about what the preferred shareholders would have done with the accompanying voting rights. Defs.' Resp. at 9. There is no "plausible model" for calculating that value, defendants contend, and thus "the class simply cannot be certified." *Id.*

Rule 23(a)(2) requires "questions of law or fact common to the class." Relying on the Supreme Court's decision in *Wal-Mart Stores*, 131 S. Ct. at 2551, the Seventh Circuit has explained that to show commonality, a plaintiff must show that the class members all "suffered the same injury." *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 497 (7th Cir. 2012) (citing *Wal–Mart Stores*, 131 S. Ct. at 2551; *Bolden v. Walsh Const. Co.*, 688 F.3d 893, 896 (7th Cir. 2012). "[S]uperficial common questions—like whether . . . each class member suffered a violation of the same provision of law—are not enough." *Jamie S.*, 668 F.3d at 497 (internal quotation marks omitted). Rather, class claims must depend on a common contention that is capable of classwide resolution, "which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart Stores*, 131 S. Ct. at 2551.

Further, under Rule 23(b)(3), the Court must find "that the questions of law or fact

common to class members predominate over any questions affecting only individual members."  This rule "is even more demanding than Rule 23(a)," and the Court has a "duty to take a close look at whether common questions predominate over individual ones."  *Comcast*, 133 S. Ct. at 1432.  The issue for Rule 23(b)(3) purposes is not whether there are individual issues—there are some individual issues in virtually every situation in which class certification is sought—but rather whether common issues predominate over any individual issues.  In particular, the need for individual damages determinations does not automatically defeat class certification under Rule 23(b)(3).  *Arreola v. Godinez*, 546 F.3d 788, 801 (7th Cir. 2008); see also 2 William B. Rubenstein & Alba Conte, Newberg on Class Actions § 4.54 (5th ed. 2013) ("Courts in every circuit have therefore uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations.").  Indeed, the Seventh Circuit recently made it clear that "[i]f the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification."  *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013); *see also Messner*, 669 F.3d at 819 ("common proof of damages for class members . . . is not required.").

To begin with commonality, defendants are not arguing that the damages calculation would be different when applied to various class members, or that the facts of each member's experience as a shareholder were different.  Commonality, as framed in *Wal-Mart*, 131 S. Ct. at 2551, is generally about whether "class members have

suffered the same injury," a "common contention" that is "of such a nature that it is capable of classwide resolution" (internal quotation marks omitted). *See also Bolden*, 688 F.3d at 896; *Jamie S.*, 668 F.3d at 497. Defendants' argument that it is uncertain how Fox can derive damages *in general* from the common share issuance appears to have little to do with commonality. There is no argument that these damages could differ among class members.

As for predominance, defendants' "damages methodology" argument seems to read a condition into the predominance requirement that the law does not necessarily impose. Defendants argue that *Comcast* requires courts to "'take a close look' into whether the plaintiff has proved that the proposed damages methodology is tied to the plaintiff's theory of liability and that 'damages are capable of measurement on a classwide basis.'" Defs.' Resp. at 7. But *Comcast* does not require this as a prerequisite to class certification, and it is incorrect for defendants to say Fox's proposed class represents "precisely the approach that was rejected" in *Comcast*.

Instead, *Comcast* requires that "any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation." *Comcast*, 133 S. Ct. at 1433 (internal quotation marks omitted); *see also Butler*, 727 F.3d at 799 ("*Comcast* holds that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide injury that the suit alleges."). Plaintiffs presented such a model in *Comcast* for a class of two million: an expert fashioned a regression model that posited hypothetical cable prices "that would have prevailed but for petitioners' allegedly anticompetitive activities"—with damages of over $875 million. *Comcast*, 133 S. Ct. at

1431.  There were, however, problems with this.  First, the district court and court of appeals incorrectly declined to question the model because they believed doing so would encompass an inquiry into the merits.  And the model had serious flaws, in that it "identifie[d] damages that are not the result of the wrong" and presented "nearly endless" permutations based on four theories of liability.  *Id.* at 1434.  The Supreme Court held that without another methodology, plaintiffs could not show predominance because "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class."  *Id.* at 1433.  "[A] model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory," the Court said.  *Comcast*, 133 S. Ct. 1433.

In this case, defendants do not make similar arguments about differing potential damages.  Rather, they argue only that there is not enough detail about how damages will be calculated.  This case presents a vastly different situation from *Comcast*, where the proposed class had two million people and a far more complex allegation of harm.  Here, there are 100 proposed class members, with damages based on a discrete series of events.

In *Parko*, another case defendants cite, the alleged damages occurred over a ninety-year period involving six defendants and perhaps other entities as well.  It was possible that proposed class members "could well have experienced different levels of contamination, implying different damages, caused by different polluters."  *Parko*, 739 F.3d at 1085.  It also could not be "assumed that every class member ha[d] experienced the same diminution in the value of his property."  *Id.* at 1086.  Because the damages included decreased property values, the fact that plaintiffs' model assumed

that the leakage of nearby contaminants over nine decades was the sole cause for the loss of value was problematic. Given these facts, "[t]he judge should have investigated the realism of the plaintiffs' injury and damage model in light of the defendants' counterarguments, and to that end should have taken evidence." *Id.* For these reasons, *Parko*, too, presented far more complex issues requiring a nuanced, highly technical presentation of potential damages than this case. Simply because damages methodologies were offered and discussed in these cases, and in others defendants cite, does not mean, as defendants urge, that there is a damages methodology *requirement*.

In any event, the proposed class in this case has 100 shareholders who hold one type of stock in one company. In her reply, Fox expands on her statement from her original memo that damages here "can be mechanically answered on a per share basis from Class members' records of holdings of the B shares." Pl.'s Mem. at 16. Any damages awarded "will be calculated using a common methodology and mathematically allocated on a per share basis to all B Shareholders who held shares between the date of the Common Share Issuance and the effective date of the Merger, inclusive." Pl.'s Repl. at 2. If a class plaintiff has received money from defendants "in a sale, the Tender, or the Merger cash-out during the Class period," it "will be deducted from such individual claimant's distribution." *Id.* at 2–3. As for defendants' contention that damages arising from the common share issuance are uncertain, Fox says that "Defendants bear the burden of showing that the price paid by Five Mile for the common shares falls within the range of fairness," and that, "after discovery and with the assistance of an expert," she will value those common shares. *Id.* at 2 n.3.

This expanded explanation was not in Fox's opening memorandum, but it is appropriately responsive to defendants' argument that the common share issuance presents particular damage calculation problems. Fox has alleged that each stockholder was injured identically, proportionate to his number of preferred shares. Even if these damages come out differently for each plaintiff, such discrepancies do not defeat class certification. *See Butler*, 727 F.3d at 801 ("[T]he fact that damages are not identical across all class members should not preclude class certification."). Given the discussion above, this contention is more persuasive than defendants' arguments about damage calculations. Similarly, Fox has adequately shown that common questions predominate over individual questions. Defendants have not persuasively identified individual questions that might predominate over common ones; it is clear that the key issue is the injury visited upon all preferred shareholders, in a collective stroke, as a result of PGRT's interactions with Five Mile. The lack of a formalized damages calculation methodology does not change this fact, setting aside the fact that such a methodology is not a prerequisite to a finding of predominance. The Court therefore concludes that Fox has satisfied the commonality and predominance requirements of Rule 23.

## C.     Adequacy and typicality

Rule 23 imposes two requirements that focus on the representative plaintiff of a proposed class. The rule requires both that "the claims or defenses of the representative parties are typical of the claims or defenses of the class" and that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(3) & (4). These requirements "tend[ ] to merge." *Amchem Prods., Inc.*

*v. Windsor*, 521 U.S. 591, 626 n.20 (1997) (internal quotation marks omitted).  The typicality requirement "directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large."  *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009).  As for whether a named plaintiff will adequately represent the class, courts look to "the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests."  *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011).  The Seventh Circuit has concluded, for example, that a class representative is inadequate when he is no longer part of the class.  *See Ruppert v. Alliant Energy Cash Balance Pension Plan*, 726 F.3d 936, 942 (7th Cir. 2013).  Conflicts of interest can also counsel against a finding of adequacy.  *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 372 (7th Cir. 2012).  Furthermore, "named plaintiffs who are subject to a defense that would not defeat unnamed class members are not adequate class representatives."  *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011).  Also, a class representative with "serious credibility problems . . . may not be an adequate class representative."  *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011).

Fox contends that her claims are typical of the class because she owned preferred PGRT stock throughout the relevant period.  She also posits that she is an adequate representative because she is knowledgeable about the case and has no conflicts of interest with those of other class members.  Defendants argue that Fox is inadequate because she lacks credibility due to a series of transgressions.  They also contend that she is subject to an unclean hands defense, because of these same

transgressions, which they argue renders her atypical. Both reasons, they contend, mean that the class should not be certified. Fox responds that defendants mischaracterize the events in question and that they misstate the unclean hands defense under Maryland law.

### 1.     Credibility

Defendants cite three incidents that they argue show that Fox "lacks credibility and will be subject to examination of that deficiency at trial." Defs.' Resp. at 20. They also contend that Fox possesses "extreme personal animosity toward Defendants [that] renders her inadequate." *Id.* at 20 n.19. The incidents include an allegedly "misleading[ ]" complaint to the SEC about Five Mile's tender offer to preferred shareholders; violation of the Court's protective order in this case and destruction of evidence of the violation; and "complicity in a leak of confidential information and then subsequent falsification of how she obtained that information." *Id.* at 20–21.

Defendants have already presented two of these allegations in their motion to disqualify Fox and her counsel from the case, which the Court rejected. *See* Defs.' Motion for Disqualification of Pl.'s Counsel & Pl. at 13 [docket no. 110] (alleging that Fox violated the protective order and "publicly posted confidential information concerning PGRT board matters on an internet message board before the information was public knowledge"); Dec. 10, 2013 Order on Defs.' Motion for Disqualification at 11 ("[T]here is no basis on the present record for disqualification of Fox as a putative class representative."). On the protective order argument, defendants now contend in addition that Fox destroyed evidence that she disclosed the confidential information. Yet they also cite a letter from Fox's counsel indicating she was complying with the

protective order by ameliorating the disclosure despite disagreeing that it was an improper disclosure, as well as Fox's testimony in her deposition admitting the deletions. *See* Defs.' Ex. 12; Stipulated Protective Order ¶ K [docket no. 43]. The same letter from Fox's attorney indicates the attorney believed the individuals who received the documents from Fox were parties to the litigation—they were former PGRT shareholders—and thus that disclosure to them did not violate the protective order. Defendants, on the other hand, argue that the recipients were not in fact parties to the litigation, which might make disclosure to them a violation of the protective order—but they do not explain why. Defs.' Resp. at 21. The Court does not see a reason to revisit its earlier conclusions regarding these allegations.

As for Fox's communications with the SEC, defendants point to an e-mail response from the SEC to Fox, apparently in response to a message or complaint she sent to the SEC in December 2011 about PGRT. *See* Defs.' Ex. 10. The body of Fox's message is included in the reply. In the message, Fox told the SEC that PGRT was cheating preferred shareholders. She also wrote: "Investors paid $25.00 and are now being forced to accept an offer of $5.25 with out [sic] any dividend arrearages of $6.75." *Id.* at FOX000414. This was a false statement, defendants argue, because Fox herself paid less than $25 for her shares, and actually profited on her investment in PGRT. Fox replies that her message to the SEC contained no false statement, because it said only that "Investors" paid that amount—not Fox herself. In her deposition, she clarified that by saying "investors paid $25," she meant that she understood the promised liquidation value of the shares was $25 and also explained that she paid less than $25 for her shares. *See* Pl.'s Repl. Ex. 1 at 124. This is a fine distinction, but Fox did add context

to her statement in her deposition. Furthermore, defendants provide no evidence that she was lying about what she meant when she clarified her statement. It would be rather a large leap to allow this allegation to render Fox non-credible in a way that would disqualify her as a class representative, a leap the Court declines to take.

Finally, defendants argue that Fox leaked confidential information via a post to a Yahoo! message board and then lied about how she obtained the information. They say that her post on Yahoo! stated "that PGRT was holding a Board meeting to approve the Common Share Issuance the next day" and that she falsely testified that she got this information from a shareholder named Treonis, who got it from janitorial staff at 330 N. Wabash. Defs.' Resp. at 21–22. First, defendants do not explain why the information in question was confidential, nor do they provide evidence that it was previously unannounced. Second, the evidence defendants offer to show that Fox lied about where she obtained the information is equivocal. Fox testified that she received the information in question from Treonis. As evidence that Fox was lying, defendants point to Treonis's own testimony. He said "he has no recollection at all of any such conversation with Plaintiff, has no reason to believe he had any such conversations with any janitorial staff, and that he had no contacts with the janitorial staff of 330 N. Wabash in 2011." *Id.* at 22. That is something short of a square denial of conversations with Fox. The Court cannot find on the present record that Fox lied about having learned this information from Treonis. The Court declines to take these allegations as a severe injury to Fox's credibility. Nor are these allegations likely to be a significant focus in future proceedings.

Finally, in a footnote, defendants argue that Fox's "extreme personal animosity"

toward them negates her adequacy as class representative. Specifically, they allege that she has referred to certain defendants on Yahoo! message boards as "dogs," "vultures," "crooks," and "spineless, well-paid lackeys for unethical, self-dealing management." Defs.' Resp. at 20 n.19 (quoting Defs.' Exs. 9, 13–15). Putting aside the fact that defendants cite no Seventh Circuit or Supreme Court authority that requires rejection of a class representative who says mean things about defendants in her case, defendants' cited cases are distinguishable. In *Smith v. Ayres*, 977 F.2d 946, 949 (5th Cir. 1992), a derivative action suit, the shareholder plaintiff and defendant were "on opposite sides of the emotionally charged feuds between the Browning and the Holloway families." The plaintiff's brief—unlike Fox's here—was "peppered with vituperative epithets, pugilistic metaphors, and descriptions of Ayres as 'satanic' and 'evil.'" *Id.* Furthermore, there had been several prior lawsuits between the parties, enough to "consume well over a full page," suggesting "virulent antagonism" on the plaintiff's part. *Id.* Fox, in contrast, posted four insults about various defendants on a Yahoo! message board. In defendants' second case, the lead plaintiff had been suing defendants for the past decade and from his deathbed made his sons swear an oath to keep up his legal fight. *Kamerman v. Ockap Corp.*, 112 F.R.D. 195, 197 (S.D.N.Y. 1986). And in the third case, "two of the three named plaintiffs (and some of the proposed class members) . . . belong[ed] to a rival union having a recent history of antagonism towards, and competition with, the defendant union." *Kamean v. Local 363, Int'l Bhd. Of Teamsters*, 109 F.R.D. 391, 395 (S.D.N.Y. 1986). In that case, "[t]he loyalty of two of the named plaintiffs to their present union, Local 3 of the International Brotherhood of Electrical Workers ("Local 3"), conflict[ed] directly with the interests of

20

those class members, a majority, who have retained their affiliation with Local 363." *Id.* There is no such allegation against Fox here, and in short, her comments do not rise to the level sufficient to convince the Court that she is "an unduly antagonistic litigant" against defendants. *Kamerman*, 112 F.R.D. at 197.

Defendants' authority from this circuit counsels that class certification should be denied when the plaintiff might "become distracted by the presence of a possible defense" or might "have to devote substantial attention" to rebutting the defense. *See* Defs.' Resp. at 22–23 (quoting *CE Design*, 637 F.3d at 726; *Lipton v. Chattem, Inc.*, 289 F.R.D. 456, 460 (N.D. Ill. 2013)). In *CE Design*, however, there were "serious doubts concerning the truthfulness of" the named plaintiff's testimony. *CE Design*, 637 F.3d at 727. And the court in that case quoted language putting the rule for denying certification in stark terms: "For an assault on the class representative's credibility to succeed, the party mounting the assault must demonstrate that there exists admissible evidence so severely undermining plaintiff's credibility that a fact finder might reasonably focus on plaintiff's credibility, to the detriment of the absent class members' claims." *Id.* at 728 (internal quotation marks omitted). The court also warned against "petty issues manufactured by defendants to distract the judge from his or her proper focus under Rule 23(a)(3) and (4) on the interests of the class." *Id.*

The Court declines to find such a severe threat to Fox's credibility here. At bottom, defendants do not contend that Fox has a conflict of interest or is no longer in the class, which courts have held are sufficient reasons to decline class certification in the past. Instead, they allege transgressions on Fox's part that the Court has already considered and rejected or that are far from ironclad reasons to doubt Fox's credibility.

They fail to mount a significant case that Fox is untrustworthy enough that she could not adequately represent the class or that the finder of fact is likely to focus on this in any significant way. The Court therefore concludes that Fox is an adequate representative of the proposed class for purposes of Rule 23.

### 2. Unclean hands

Because of the above allegations, defendants contend Fox will be subject to an unclean hands defense, which they say makes her an atypical plaintiff. It is true that "named plaintiffs who are subject to a defense that would not defeat unnamed class members are not adequate class representatives." *Randall*, 637 F.3d at 824. Fox responds that these incidents do not represent wrongful actions, so the defense fails. She also contends that the unclean hands defense is not available unless the plaintiff's wrongful actions are the source of her claim, which is not the case here.

Fox is correct. In Maryland,

> [i]t is only when the plaintiff's improper conduct is the source, or part of the source, of his equitable claim, that he is to be barred because of this conduct. What is material is not that the plaintiff's hands are dirty, but that he dirties them in acquiring the right he now asserts.

*Jones v. Anne Arundel Cnty.*, 432 Md. 386, 412, 69 A.3d 426, 441 (2013). Defendants do not cite or acknowledge anything like this in their brief, despite the fact that it is clearly the established rule in Maryland. *See, e.g.*, *Dickerson v. Longoria*, 414 Md. 419, 455, 995 A.2d 721, 743 (2010); *Wells Fargo Home Mortg., Inc. v. Neal*, 398 Md. 705, 729–30, 922 A.3d 538, 552–53 (2007); *Roper v. Camuso*, 376 Md. 240, 273–74, 829 A.2d 589, 609–10 (2003). And they make no allegation that any of Fox's alleged wrongful actions make up the source of her claims.

### 3.   Summary

In short, defendants' arguments against Fox as class representative do not reveal a significant challenge to her credibility, as would be necessary to consider rejecting class certification based on her personal failings.  And because defendants do not appear to have a viable unclean hands defense under Maryland law as to Fox personally, the existence of that defense is not a good reason to declare her an inadequate class representative.

### D.   Adequacy of class counsel

"The adequacy heading also factors in competency and conflicts of class counsel."  *Amchem Prods.*, 521 U.S. at 626 n.20.  In addition to arguing that Fox is an inadequate class representative, defendants argue that the Court should not appoint attorneys Berger and Krislov as class counsel.  They acknowledge that the Court already denied their motion to disqualify these attorneys, but they now expand upon their earlier motion, contending that "counsels' behavior was more egregious and pervasive than the Court and Defendants were previously aware."  Defs.' Resp. at 23. They give three reasons: (1) Berger and Krislov helped Samuel Orticelli, a former trustee of PGRT, breach a fiduciary duty and confidentiality agreements; (2) they inappropriately contacted Orticelli when he was a PGRT trustee, they were litigating against PGRT, and PGRT was represented by counsel; and (3) Berger filed an affidavit "patently at odds with" testimony of Orticelli, whom Berger represents.  *Id.*

In its earlier order, the Court held that disqualification would be a "drastic remedy on the present record" and stated that it was "unpersuaded that counsel's possession and review of a small number of work product-protected materials that have no

apparent bearing on the present dispute warrant depriving Fox of the counsel of her choice." Dec. 10, 2013 Order on Defs.' Motion for Disqualification at 11. The Court concluded that the documents Orticelli gave Krislov were covered by the fiduciary exception to the attorney-client privilege. This exception states that "a trustee who obtains legal advice related to the execution of fiduciary obligations is precluded from asserting the attorney-client privilege against beneficiaries of the trust." *United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313, 2319 (2011). The Court also concluded that certain documents were subject to the work-product doctrine and had to be returned to defendants but that the documents were not relevant to the present case.

Defendants now cite Orticelli's deposition and a lawsuit Krislov and Berger worked on, which defendants say was adverse to PGRT, as evidence that Krislov and Berger should not "be relied on to adequately represent the class." Defs.' Resp. at 24. Fox answers defendants' allegations against the attorneys one by one, contending they "go beyond stretching the truth, engaging in rhetoric that borders on sanctionable conduct." Pl.'s Repl. at 16. Defendants do not offer any authority by which to judge their allegations or their request that the Court decline to designate Krislov and Berger as class counsel. Further, defendants no longer claim, as they did in their motion for disqualification, that the documents Orticelli gave Krislov and Berger violated the attorney-client privilege or the work product doctrine. Rather, they argue only that Krislov and Berger cannot "adequately represent the class," Defs.' Resp. at 25, because they helped Orticelli breach his confidentiality agreements and talked with Orticelli (a PGRT trustee) when they represented shareholders suing PGRT's board in a different case, and because Berger lied in an affidavit.

In the Seventh Circuit, "[m]isconduct by class counsel that creates a serious doubt that counsel will represent the class loyally requires denial of class certification." *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011). It is clear that "misconduct that prejudices the class or creates a direct conflict between counsel and the class requires" denial of class certification, as does non-prejudicial unethical conduct that "jeopardizes the court's ability to reach a just and proper outcome in the case." *Reliable Money Order, Inc. v. McKnight Sales Co., Inc.*, 704 F.3d 489, 498–99 (7th Cir. 2013). However, "when an ethical breach neither prejudices an attorney's client nor undermines the integrity of the judicial proceedings, state bar authorities are generally better positioned to address the matter through disciplinary proceedings, rather than the courts through substantive sanction in the underlying lawsuit." *Id.* at 502. These cases do not necessarily encompass the request defendants are making here; their response does not explicitly call for denial of certification on the basis of Krislov and Berger's conduct. Rather, they ask only that Krislov and Berger not be appointed class counsel and they do not suggest what should happen with respect to class certification if the Court agrees. The Court will therefore assume the *Ashford Gear* "serious doubt" standard applies to defendants' argument.

Given this standard, defendants' new allegations about Krislov and Berger do not produce the "serious doubt" necessary for finding class counsel inadequate at the certification stage. First, defendants do not argue that Berger and Krislov's dealings with Orticelli prejudiced their clients in this case—the class plaintiffs—or that they have a conflict of interest of some sort. Second, the allegations, taken as true, do not necessarily "jeopardize[ ] the court's ability to reach a just and proper outcome in the

case." *Reliable Money Order*, 704 F.3d at 499. The Court has already determined that attorney Krislov "acted imprudently" in accepting documents from Orticelli and that Krislov should "have sought instructions immediately upon receiving the documents" or "declined the representation of Orticelli to begin with." Dec. 10, 2013 Order on Defs.' Motion for Disqualification at 10. The Court nonetheless decided that counsel's possession and review of documents with "no apparent bearing on the present dispute [do not] warrant depriving Fox of the counsel of her choice." *Id.* at 11. The same result follows with the documents defendants point to here. There is no accusation that they have anything to do with *this* litigation.

To start with Berger's affidavit, Fox is correct that defendants mischaracterize the document. Defendants argue that Berger "swore that he only received four specific documents from Mr. Orticelli" but that Orticelli testified that he gave Berger additional items. Defs.' Resp. at 25. That is not, however, what Berger's affidavit says. It says, "aside from documents 3, 10, 11, and 12 [the four documents] on Defendants' log, *I have not viewed* the documents Samuel A. Orticelli produced to the Defendants in response to the subpoena issued to him." Docket no. 119-4 ¶ 4 (emphasis added).

Defendants also contend that Krislov and Berger communicated with Orticelli, a PGRT trustee, when they represented a party adverse to PGRT. They argue that this interaction "raises concerns regarding Illinois Rules of Professional Conduct 4.2, which prohibits *ex parte* communications between an adverse lawyer (Mr. Berger and Mr. Krislov) and a director of corporation [sic] whom they are suing (Mr. Orticelli)." Defs.' Resp. at 25. But as Fox points out, that litigation concerned events prior to Orticelli's tenure as a trustee and thus is not directly relevant to the litigation at hand. Fox

contends that the litigation in question "challenged the PGRT Board's cumulative dividend distributions of $121 million to Prime Office from 2005 to 2006," Pl.'s Repl. at 20, and defendants do not argue otherwise in their response brief. It appears Fox is correct; Orticelli was elected to the PGRT board as a trustee in 2011.

As for whether Orticelli gave Krislov and Berger documents that contravened his confidentiality agreement with PGRT, defendants have not argued that any of the documents were relevant to this litigation. Relevance to the litigation at hand was an important factor in the Court's prior rejection of defendants' motion to disqualify, and a similar result is warranted here. Further, Orticelli has testified that the information he gave to Krislov and Berger was for the purpose of acquiring legal advice; defendants do not point to authority stating he could not do so. Indeed, the complete lack of legal authority in defendants' brief makes it unclear on what basis they expect the Court to rule in their favor on this argument. In sum, their arguments about Fox's attorneys provide no basis to reject class certification or appointment of Krislov and Berger as class counsel. The Court concludes that class counsel are adequate for purposes of Rule 23.

**E.     Unjust enrichment claim**

In addition to the Rule 23 arguments the Court has addressed, defendants argue that Fox's unjust enrichment claim is not an appropriate candidate for class certification. They contend that, in general, unjust enrichment claims are not subject to class-wide treatment and that individualized determinations would have to be made in order for the class to litigate the unjust enrichment claim.

### 1.     Common share issuance

First, defendants argue that Fox's allegations regarding the common share issuance require individualized evidence to prove that each class member "relied on the promise of a common share dividend and expected to receive voting rights."  Defs.' Resp. at 15.  Fox responds that hers is not an expectation-based claim but rather a claim that all preferred shareholders were entitled to voting rights.  "The very essence of Plaintiff's claim, and Plaintiff's complaint generally, is that Defendants acted improperly to prevent the sole owners of PGRT (the B Shareholders) from ever exercising their right to control the future of PGRT by improperly transferring PGRT's common share voting rights to Five Mile."  Pl.'s Repl. at 9.  Fox says the Court does not need to make individual inquiries because the unjust enrichment claim here is connected to a breach of fiduciary duty claim, which focuses on defendants' behavior and not that of any individual plaintiff.

The Court has already addressed in this case Maryland law regarding unjust enrichment.  In its ruling on defendants' motion to dismiss, the Court said that an unjust enrichment claim under Maryland law requires "that (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant was aware of the benefit; and (3) the defendant accepted or retained the benefit under circumstances that make it inequitable for the defendant to do so without the payment of its value."  *Fox*, 2013 WL 1966382, at *9 (citing *Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94–95, 747 A.2d 600 (2000)).  From this rule, it seems clear that the emphasis of an unjust enrichment claim in Maryland involves the actions of the defendants, not the plaintiff's state of mind.

Defendants point to the background section of Fox's amended complaint in which she states that, prior to the common share issuance to Five Mile, "[i]t was understood that the holders of the B Shares would now, reflecting their sole ownership of PGRT, be given voting rights in the form of a common share dividend."  Amended Compl. ¶ 57 [docket no. 67].  This is evidence, defendants say, that "for a class member to recover she must demonstrate, through individualized proof, that she received, read, and relied upon the proxy statement and 'understood' that she would receive a dividend and attendant voting rights."  Defs.' Resp. at 15.  Fox argues that whether a shareholder read a disclosure is "immaterial," because defendants' actions alone define the claim.  Pl.'s Repl. at 9.  The way the unjust enrichment claim is written in the amended complaint appears to bear this out:  "Five Mile was unjustly enriched, to the detriment of and at the expense of Plaintiff and the Class, as a result of their unlawful and inequitable conduct, through which voting control and the value of the assets of PGRT were transferred solely to Five Mile by cancelling the shares of minority holders of the B Shares for insufficient consideration."  Am. Compl. ¶ 145.  An individual plaintiff's awareness or unawareness would not seem to have a great deal of relevance on this question.

Defendants cite Maryland state cases for the proposition that the third element of an unjust enrichment claim requires a "fact-specific balancing of the equities."  Defs.' Resp. at 14 (citing *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 302, 936 A.2d 343, 355 (2007); *Royal Investment Group, LLC v. Wang*, 183 Md. App. 406, 440, 961 A.2d 665, 685 (Md. Ct. Spec. App. 2008)).  The latter of these cases provides a detail, not quoted by defendants, on what it means by "the equities":  "The equities of a

case are usually taken to refer to matters of fault, ethical position, and delay." *Royal Investment Group*, 183 Md. App. at 440. Defendants do not argue that any of these apply to plaintiffs in this case; there is no equitable estoppel argument, for example, as there was in *Hill*. Defendants also rely on a Fourth Circuit case from the Federal Appendix, which in turn relies on a 1934 Court of Appeals of Maryland case, to argue that unjust enrichment claims require an expectation of benefit on the plaintiff's part. However, the 1934 case is vague on the matter at best, and the Federal Appendix case is not binding even on the Fourth Circuit.

The Court does not consider these authorities controlling. They do not contribute significantly to the statement of law the Court has already made with regard to unjust enrichment claims in Maryland. Reading in a requirement of expectation of a benefit is not required by Maryland law. Fox's unjust enrichment claim, as stated in the amended complaint and reiterated in memoranda associated with the class certification motion, adheres to Maryland law in that it requires no such expectation, and does not require individualized inquiries into the state of mind of each plaintiff. The Court therefore declines to conclude that Fox's unjust enrichment claim regarding the common share issuance fails to meet the requirements of Rule 23. Fox has established the required commonality and predominance elements with respect to this particular claim.

### 2.    Class conflict

Because Fox's unjust enrichment claim is based on two events—the common share issuance and the 2012 merger—defendants also contend that there is a schism in the proposed class. They argue Fox's claim is atypical of the claims of the class "because the claim cannot be satisfied by common proof and individual issues and

defenses will predominate."  Defs.' Resp. at 18.  Defendants say that class members

with damages based on one event "will necessarily compete" with those who have

damages from the other.  *Id.*  They argue that "[t]he interests of these individuals will

conflict as to the factual basis for proving liability, the viability of defenses against the

different transactions, and the allocation of any recovery."  *Id.*  Also, defendants contend

that injuries differ among shareholders, for example, those who sold their shares after

the merger announcement for lower than the merger price, as compared with those who

voted for the merger.  Fox responds that damages based on each event "are separately

calculable" and that there is thus no basis to believe class members will "compete."

Pl.'s Repl. at 11.  She also argues that individual damages differences do not preclude

class certification.

It is true that a proposed class does not satisfy the adequacy requirement of Rule

23(a)(4) if there are "conflicts of interest between named parties and the class they seek

to represent."  *Amchem Prods.*, 521 U.S. at 625.  This requirement serves the principle

that "a class representative must be part of the class and possess the same interest and

suffer the same injury' as the class members."  *Id.* at 625–26 (internal quotation marks

omitted).  The Seventh Circuit has affirmed a district court's decision to certify a class

despite conflicts that were "too hypothetical to bar class certification."  *Johnson v.

Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 372 (7th Cir. 2012).  In that case,

the defendant had a list of class members and "could have found one—if there is one—

who if informed of the class action would express concern that it might harm him."  *Id.*

The defendant either did not look for or find such a class member; the Seventh Circuit

said that if the alleged class conflict moved beyond the speculative and "prove[s] real,"

the district court could divide the subclasses in the case and appoint new class representatives. *Id.* Similarly, in *Kohen*, the Seventh Circuit held that when "the existence of such conflicts is hypothetical . . . the district court can certify subclasses with separate representation of each" at a point "[i]f and when [the conflicts] become real." 571 F.3d at 680. "To deny class certification now, because of a potential conflict of interest that may not become actual, would be premature." *Id.*

The one case defendants cite for the proposition that class conflicts preclude certification is unquestionably distinguishable from this case. *See Jones v. Nat'l Council of YMCAs*, No. 09 C 6437, 2013 WL 7046374, at *23 (N.D. Ill. Sept. 5, 2013). There, two named plaintiffs "both had critical roles in the development, implementation, and administration of the very policies the lawsuit attacks as discriminatory." *Id.* Defendants allege nothing similar here.

To the extent that defendants argue that there is a conflict of interest between plaintiffs with damages based on the common share issuance and those based on the merger, defendants have provided no explanation for such a conflict beyond the hypothetical. Fox argues convincingly that her own claims are not atypical of those of the class because of this alleged conflict of interest, because she is not a member of only one of the two groups defendants identify; rather, she was a preferred shareholder during both events. Furthermore, as discussed, the Seventh Circuit has held that predictions of conflict such as defendants' are insufficient. If the conflict proves to be a reality in the future, the Court can adjust the definition of the class or provide for subclasses. In sum, defendants do not offer any good reason to reject certification of the class on Fox's unjust enrichment claim. This claim is as equally subject to class

treatment as Fox's other claims.

## Conclusion

For the foregoing reasons, the Court grants plaintiff Fox's motion for class certification [docket no. 105].  The Court certifies the following class under Rule 23(b)(3):  all holders of Prime Group Realty Trust's Series B Cumulative Redeemable Preferred Stock during the period November 1, 2011 through December 26, 2012, inclusive, who were damaged by Defendants' actions (the "Class"), with the following persons excluded:  the defendants named in Plaintiff's Amended Class Action Complaint ("Original Defendants," listed below); any subsidiaries of the Original Defendants; the members of the individual defendants' immediate families; the legal representatives, heirs, successors and assigns of any excluded person or entity; and the plaintiffs in the *Rameson* litigation who were parties to the settlement of that litigation and the resulting release of future claims.  The Original Defendants are Riverview Realty Partners (f/k/a Prime Group Realty Trust), Riverview Realty, LLC, Riverview Realty Merger Sub, LLC, Five Mile Capital II Chicago Reit Preferred Investor SPE LLC, Five Mile Capital II Chicago Reit Equity Investor SPE LLC, Jeffrey A. Patterson, James G. Glasgow, Jr., Scott R. Leitman, David L. Reynolds, Shawn R. Tominus, John M. Sabin, George R. Whittemore, James F. Hoffman, Paul G. Del Vecchio, Steven R. Baron and Victoria A. Cory.  The Court also appoints the following attorneys as class counsel:  Clinton A. Krislov, John Orellana, Robin Switzenbaum, Lawrence Deutsch, Jeffrey L. Osterwise, and Gerald W. Berger.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  April 22, 2014

33